# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

J. DAVY YOCKEY and JOSEPHINE YOCKEY,
husband and wife, individually and on behalf
of all others similarly situated,

            Plaintiffs,                          CASE NO:

            v.

THE 3M COMPANY (f/k/a
MINNESOTA MINING and                  JURY TRIAL DEMANDED
MANUFACTURING CO.); ANGUS
FIRE; THE ANSUL COMPANY;
BUCKEYE FIRE PROTECTION;
CHEMGUARD and NATIONAL FOAM,

            Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs, J. Davy Yockey and Josephine Yockey ("Plaintiffs") individually and on behalf of all others similarly situated, by and through their attorneys, brings this complaint against The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire, The Ansul Company, Buckeye Fire Protection; Chemguard and National Foam (collectively "Defendants"), for monetary damages, declaratory, injunctive and other relief as a result of the use of hazardous chemicals and compounds which contaminated public and private water sources , including Plaintiffs.  In support of their Complaint, Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs bring this action against the Defendants for medical monitoring, monetary damages and real and personal property damage as a result of the contamination of their drinking water at their homes by chemicals and toxic compounds manufactured and sold

by Defendants. Defendants manufactured and then sold the chemicals without warning to the buyers of the toxic effects these chemicals and compounds could cause to the environment and residents like the Plaintiffs who would be exposed to these chemicals and compounds after they entered the groundwater and polluted the public and private drinking wells. Nor did the Defendants provide purchasers and users of their products with proper and adequate instructions on how to store, use and dispose of their products to prevent the foreseeable harm to the environment and human health.

2.     Defendants, The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire, The Ansul Company, Buckeye Fire Protection, Chemguard and National Foam for years, have manufactured and sold Aqueious Film Forming Foam ("AFFF") as an agent for civil and military firefighters which was used by the US Navy for use on military bases which included Willow Grove Naval Air Station Joint Reserve Base in Pennsylvania and the Naval Air Warfare Center in Warminster Township Pennsylvania (collectively, "The Bases").

3.     At all times material hereto, the AFFF manufactured and sold by Defendants contained perfluoroochemical compounds ("PFCs") such as perfluorooctanoic acid ("PFOA"), perfluorooctanesulforic acid ("PFOS") and other known or suspected toxic compounds.

4.     Plaintiffs and all other homeowners in the areas surrounding and near The Bases predominately use drinking water supplied to them by wells on their property. In fact, very little of the residents have water supplied to them by a municipality. Thus, residents in the areas surrounding and near The Bases have been drinking and otherwise consuming water contaminated with chemicals including but not limited to PFOS and PFOA. These chemicals cause serious health risks. Further, when Plaintiffs and individual class members either seek to refinance and/or sell their home, the disclosure that their drinking water is contaminated with

2

chemicals will significantly reduce the value of the property. It is upon information and belief that Plaintiffs' property is contaminated by the Defendants' AFFF which has contaminated wells that supply water to Plaintiffs' and members of the class' homes.

5.     The product AFFF, manufactured by Defendants, contains chemicals PFOS and PFOA which are hazardous to the enviorment and the public.

6.     Defendants, as manufacturers and sellers of AFFF, knew or should have known that the chemicals presented an unreasonable risk of personal injury and property damage to the class members. Nonetheless, Defendants marketed and sold these products without full disclosure that the use of these products would cause serious damage to surrounding communities and water supply in the areas where it is used.

7.     Plaintiffs and members of the class have been exposed to these chemicals for years, well above safe drinking levels.

8.     Due to the contamination of their water supply, Plaintiffs and members of the class must purchase bottled water for drinking and cooking which they otherwise would not have had to purchase if their water was not contaminated with PFCs.

9.     Plaintiffs brings this suit on behalf of themselves and all others similarly situated to collect damages for property damage, loss of the use and enjoyment of property, costs and expenses incurred and to be incurred, other damages and to seek monitoring for potential risks of health they and members of the class have been exposed to.

## II.    PARTIES

10.     Plaintiffs are citizens of the Commonwealth of Pennsylvania and reside at 1158 McKean Road, Ambler, Pennsylvania 19002, Horsham Township. Plaintiffs purchased this property for $460,000 on November 5, 2015. At the time of the purchase, Plaintiffs were not

aware of the contamination of their property and the surrounding area near The Bases . They did not learn of the contamination until the summer of 2016. Plaintiffs' home is supplied with water through a private well which is their only source of water.

11.     Defendant, The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, MN 55133. From 2002, 3M has manufactured AFFF that contained PFOS and PFOA.

12.     Defendant, Angus Fire ("Angus") has corporate headquarters in Bentham, United Kingdom. Angus Fire maintains a place of business in the United States at 14 Junny Road, Angier, NC 27501. At all times relevant hereto, Angus manufactured fire suppression products including AFFF that contained PFOS and PFOA.

13.     Defendant, The Ansul Company ("Ansul") has its principal place of business at One Stanton Street, Marinette, WI 54143. At all times relevant hereto, Ansul manufactured and sold fire suppressant products including AFFF that contained PFOS and PFOA.

14.     Defendant, Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086. At all times relevant hereto, Buckeye manufactured and sold fire suppression products including AFFF that contained PFOS and PFOA.

15.     Defendant, Chemguard ("Chemguard") is a Wisconsin corporation having its principal place of business at One Stanton Street, Marinette, WI 54143. At all times relevant hereto, Chemguard manufactured and sold fire suppression products including AFFF that contained PFOS and PFOA.

16.    Defendant, National Foam, Inc. (a/k/a Chubb National Foam) ("National Foam") is a Pennsylvania corporation having its principal place of business at 350 East Union Street, West Chester, PA 19382.  At all times relevant hereto, National Foam manufactured and sold fire suppression products including AFFF that contained PFOS and PFOA.

## III.    JURISDICTION AND VENUE

17.    Jurisdiction is proper in this Court.  The Defendants conduct substantial business in and throughout this jurisdiction and have purposely availed themselves to this jurisdiction. Further, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), the aggregate amount in controversy exceeds $5,000,000 and Plaintiffs' class are citizens of different states of at least one defendant.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events that give rise to the cause of action occurred in the United States Eastern District.  Further, class representative Plaintiffs reside in and are a citizens of Pennsylvania.

## IV.    FACTUAL ALLEGATIONS

19.    PFCs are not created by nature. Nor do they naturally exist in the environment. Rather, they are manufactured chemicals.

20.    The toxic and hazardous compounds in PFC include but are not limited to PFOS and PFOA.

21.    Numerous known health risks are associated with chronic exposure to, for example, PFOA. These risks are present even where PFOA is ingested at very low levels such as less than 1.0 part per billion (ppb).

22.    The health risks associated with PFOA are exacerbated because it can stay in the environment and in the human body for extended periods of time.

23.     Studies show that PFOA is readily absorbed after oral exposure and accumulates primarily in the serum, kidneys, and liver. The half-life of PFOA in the human body is two to nine years.

24.     Findings in studies further indicate that individuals who have had chronic or occupational exposure to PFOA run a higher risk of bladder or kidney cancer.

25.     Animal studies revealed that PFOA exposure led to an increased risk of tumors on the liver, testicles, mammary glands and pancreas.

26.     PFA exposure over 0.5 ppb is associated with increased risk of cancer such as testicular, kidney, and thyroid. In addition, this level of exposure is associated with incidences of other medical conditions such as high cholesterol, ulcerative colitis and pregnancy-induced hypertension.

27.     These diseases or health conditions can lay dormant and manifest themselves months or even years after one is exposed to PFOA.

28.     According to the Environmental Protection Agency ("EPA"). "PFOA and PFOS pose potential adverse effects to the environment and human health." Such adverse effects include, but are not limited to, kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, high cholesterol and other diseases.

29.     PFCs, including PFOS and PFOA, have been widely used for decades in industry and in the manufacture of industrial and commercial products because of their ability to repel water, oil and grease.

30.     At all times relevant hereto, Defendants despite knowing the dangers and hazardous effects of PFCs, including PFOS and PFOA, used these chemicals in the manufacture

6

of their respective AFFF, all of which was purchased by the US Department of Navy and used at The Bases.

31.     At all times relevant hereto, The United States Navy, Air National Guard, Marines and Air Force as well as civilian fire fighters conducted training exercises at The Bases. As part of the training exercises military and civilian firefighters use of AFFF included but was not limited to: extinguishing fires and explosions on the ground and runways, simulation of extinguishing fires and explosions on the ground and runways, spraying runways in anticipation of a landing which may result in a crash and other simulation or training, all of which led to the ground, runways and adjacent soil being covered with AFFF and the byproducts of AFFF from runoff.

32.     AFFF chemicals contain PFCs developed in the 1960s as an alternative to existing firefighting foam.  PFCs contain and/or degrade into PFOS and PFOA.

33.     At all times relevant hereto, The Department of Navy used AFFF for firefighting foam at The Bases. Thousands of gallons of AFFF was stored at The Bases in drums, tankers, buckets, sprinkler systems and other containers. The AFFF was stored throughout the Bases and especially in aircraft hangers protected by ceiling units containing hundreds of gallons of AFFF.

34.     Upon information and belief, the accidental discharges occasionally occurred within the aircraft hangers resulting in discharge of hundreds of gallons of AFFF.

35.     Upon information and belief, the personnel at The Bases cleaned the hangers by washing the foam down the drains.

36.     The toxic and hazardous PFCs used at The Bases have entered the groundwater of Warminster, Warrington and Horsham Townships contaminating and polluting the public water supply and private drinking wells.

37.    Upon information and belief, the instructions and warning labels affixed to the AFFF by the Defendants do not accurately describe the scope of danger associated with the use of AFFF. Nor do they provide appropriate and adequate instructions and warnings regarding the storage, use and disposal of AFFF.

38.    There were no warnings provided prior to May, 2000 with regards to the health risks associated with AFFF and the risks associated with the disposal of AFFF components.

39.    In 2002, 3M ceased production of AFFF manufactured products with PFOS due to health and environmental concerns.

40.    It is upon information and belief that 3M knew of risks the health and environmental for years prior to pulling their AFFF product from the market.

41.    Despite 3M pulling their product from the market, no other Defendant recalled their product that used toxic surfactant after 2002.

42.    In one study in 2011, it was reported that there were millions of gallons of PFOS-based AFFF stockpiled in the United States.

43.    It is upon information and belief that all personnel at The Bases were using AFFF for emergency training exercises until The Bases closed in 2011.

44.    Notwithstanding The Bases being on the EPA's National Priorities List (the "NPL") for over two decades, direct EPA oversight has not been able to:

    a.    prevent ongoing PFC use and disposal at The Bases;

    b.    prevent and abate contamination and migration of these toxic contaminants to local public and private drinking water sources;

    c.    prevent and bate drinking water contamination by PFCs; and

d. prevent ingestion and bioaccumulation of PFCs by residents near and surrounding
The Bases.

45.    As a result of these decades-long failures the Plaintiffs, their neighbors and surrounding residents near The Bases have not only been exposed to the toxic hazards from these contaminates and hazardous substances, but also, have suffered a diminution in value of their property due to the contamination and incurred other costs and expenses.

## V.    SUMMARY OF LAW OF THE REGULATORY LAW

46.    In 2009, the Environmental Protection Agency ("EPA") established a Provisional Health Advisory (" PHA") for PFOS and POFA.

47.    In 2009, PHA for PFOS was 200 ppt and the PHA for PFOA was 400 ppt. The PHAs state that the discovery of PFOA and/or PFOS in water above the advisory levels should result in the discontinued use of the water for drinking and cooking.

48.    In 2012, the EPA included PFOS and POFA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"). The EPA required certain water providers across the country including those in Horsham, Warminster and Warrington to test their water for presence of PFOS and PFOA.

49.    It was in 2014 that the Horsham Water and Sewer Authority tested its municipal wells. The testing showed that its wells were contaminated with PFOS and PFOA. The Horsham Water and Sewer Authority immediately shut down those wells.

50.    Subsequently, Horsham Water and Sewer Authority retested all of its wells, all of which showed it was contaminated with PFOS and PFOA. Horsham shut down five of its wells due to its PFOS and PFOA contamination.

9

51.     Between 2013 and June, 2014, the Warminster Municipal Authority also tested its wells. The testing showed PFOS levels of 40 ppt to 1090 ppt and PFOA levels of 20 PPT to 890 PPT.

52.     The Warminster Municipal Authority closed six of its wells due to PFOS and PFOA contamination.

53.     Warminster Township also participated in the UCMR3 during 2014 and 2015. The testing showed PFOS levels as high as 1600 ppt and PFOA levels up to 270 ppt.

54.     Warrington Township closed three of its wells and eventually closed five of its wells due to PFOS and PFOA contamination.

55.     In May, 2016 the EPA issued a final health advisory for PFOS and PFOA.

56.     It is upon information and belief that 140 wells have been shut down to date and those homes have been provided bottled water for drinking. Also, 16 public wells have been shut down. In the three townships of Horsham, Warrington and Warminster, it is estimated that 500 properties have private wells. Of that 500, 140 have been shut down. It is upon information and belief that all of the properties in the above townships are contaminated.

57.     It is upon information and belief that the PFOA and PFOS from AFFF has contaminated the aquafier which contaminated the wells that supply water to these homes.

58.     In Summer, 2016, Plaintiffs were informed that their property's and surrounding area's water which is supplied by private wells is more than likely contaminated by PFCs from the Bases that entered the groundwater and contaminated and polluted the public and private wells. Upon and information and belief, the source of the PFCs is Defendants' AFFF products used at The Bases.

10

59.    The discharge of contaminants and hazardous substances from The Bases into the groundwater continues to this very day.

60.    High levels of PFCs are migrating from discharge points at the Willow Grove facility to Park Creek, Little Neshaminy Creek and various unnamed tributaries.

61.    These surface water bodies regularly recharge with groundwater and act as continuing sources of contamination of groundwater for public and private water supplies which presents an imminent and substantial danger to the public's health and environment at large.

**Class Definition**

62.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

63.    Plaintiffs bring this class action pursuant to the Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of a class consisting of all persons similarly situated as members of the proposed class:

> Property owners who have resided in their current addresses and who have obtained drinking water from either Horsham Water and Sewer Authority, Warminster Municipal Authority, Warrington Township Water and Sewer Department or from a private well whose property is contaminated.

## VI.    CLASS ALLEGATIONS

64.    Upon information and belief, it is alleged that there are thousands of members of the class.  The proposed class is so numerous that joinder of all its members is impractical.

65.    There are numerous questions of law and fact common to the members of the class including:

    a.    Whether Defendants owed a duty to Plaintiffs and members of the class;

    b.    Whether Defendants AFFF products contained PFCs;

c.  Whether the PFCs from Defendants' AFFF products used at The Bases entered the groundwater and polluted and contaminated the water supplies in Warminster, Warrington, and Horsham Townships;

d.  Whether Defendants knew or should have known that they manufactured AFFF containing toxic chemicals which were unreasonably dangerous;

e.  Whether Defendants knew or should have known that their AFFF contained persistent nonbiodegradeable chemicals that were likely to contaminate public and private drinking water supplies;

f.  Whether Defendants failed to provide warnings and instructions regarding the proper storage, use and disposal of their AFFF products to prevent ground water contamination and contamination of public and private drinking water supplies;

g.  Whether Defendants failed to warn users of the harmful effects of their AFFF products;

h.  Whether Defendants later became aware of the health and environmental harm caused by their AFFF products and failed to inform users of these harmful and toxic effects and precautions they should take with the storage, use and disposal of AFFF to prevent these harmful effects from occurring;

i.  Whether Plaintiffs and members of the class suffered diminished value in their property; and

j.  Whether Plaintiffs and members of the class are entitled to medical monitoring because of their increased risk of harm as a result of their exposure to and consumption of contaminated water.

66.    Plaintiffs' claims are typical of the claims of the class. Plaintiffs and all members of the class have sustained damages. The financial losses of all members of the class were directly caused by the Defendants' conduct that caused property damage and their exposure to and ingestion of contaminated water.

67.    Plaintiffs can and will fairly and adequately represent and protect the interests of the class and have no conflict of interest with respect to any named or unnamed members of the class and fully intend to prosecute this action.

68.    Plaintiffs fully appreciate their role of representing thousands of homeowners who have been subject to contamination.

69.    Plaintiffs have retained competent counsel who is experienced in class actions and environmental litigation. Counsel will fairly and adequately protect the interests of the class.

70.    Plaintiffs have adequate financial resources or has made ethical arrangements with counsel whereby the cost of the administration of this litigation will be fully undertaken and provided.

71.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy. Questions of law and fact predominate over any questions affecting only individual members including pleading and factual issues related to liability and remedies.

72.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants.

73.    Proceeding by way of class action is a fair and efficient method of adjudicating this controversy. This is an action in which individual damages are too small an amount to

justify the prosecution of separate claims by individual class members against large multinational corporations such as Defendants.

74.    The damages to the class in the aggregate are large enough to justify the significant expense for research, investigation, discovery, hiring of experts and trial preparation which require prosecution of the claims on behalf of the class.

75.    This action is manageable as a class action.

### Rule 23 Injunctive Relief

76.    In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the members of the class as a whole, such that final injunctive relief is appropriate with respect to each of the members of the class as a whole.  Such injunctive relief includes, but is not limited to, an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and the members of the class to test for the presence of PFOS and/or PFOA in their blood serum; and the implementation and funding of a medical monitoring program for the Plaintiffs and the members of the class sufficient to monitor the Plaintiffs and the class' health to ensure they are adequately protected from the deleterious effects of PFOS and PFOA on the human body.

### COUNT I
### NEGLIGENCE
**(Against Defendants)**

77.    Plaintiffs hereby incorporate by reference all preceding paragraphs above, as if the same were set forth at length.

78.     Defendants, at all relevant times material hereto, acted through its respective officers, employees and agents, who in turn were acting within the scope of its authority, and in furtherance of the business of Defendants.

79.     At all times relevant hereto, Defendants had a duty to manufacture, market, advertise and sell their AFFF in reasonable manner that avoided or prevented harm to those who foreseeably would come into contact with or be exposed to their AFFF products and its toxic and hazardous chemicals.

80.     Defendants' duty included providing instructions and warnings to purchasers and users of their AFFF products about the hazards of the product and the risks of injury posed by the dangerous and unsafe chemicals in the products.

81.     Defendants knew or should have known that manufacture and sale of AFFF containing PFCs was hazardous to human health and the environment.

82.     Defendants knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture and sell AFFF using PFCs to end users such as the Department of Navy because it was certain that the toxic and dangerous chemicals (PFOS and PFOA) would migrate from The Bases to the groundwater and contaminate the public and private water supplies.

83.     Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF they manufactured and sold had the propensity to migrate from The Bases to the groundwater and contaminate the public and private water supplies, all of which resulted in harm to the environment and the public's health and wellbeing.

84.    The aforementioned risks associated with the storage, use and disposal of AFFF were not disclosed by Defendants to purchasers or users of the products. Nor were these risks known or obvious to purchasers and users of AFFF.

85.    Upon information and belief, Defendants failed to provide instructions or warnings to the purchasers and users of the AFFF that use, storage and disposal of AFFF could result in the contamination of groundwater and drinking water and which posed dangers to human health and environment.

86.    Proper instructions and warnings by Defendants would have led to users of the AFFF taking appropriate measures to store, use and dispose of the AFFF thereby eliminating or reducing the PFCs in the AFFF from migrating from The Bases into the groundwater and contaminating and polluting the public and private water supplies.

87.    Plaintiffs and the class are foreseeable victims of the harm caused by Defendants' negligent manufacture, advertising, marketing, sale and distribution of AFFF which was used at The Bases.

88.    As a result of Defendants' negligence, the drinking water in and around The Bases, including public water supplies, and the private wells, is contaminated and polluted with unsafe levels of PFOS and POFA from Defendants' AFFF products used at The Bases.

89.    As a result of Defendants' negligent acts and omissions, extensive contamination of the drinking water has been documented at the Plaintiffs and class members' properties.

90.    Contamination of Plaintiffs' and class members' properties and drinking water is ongoing and as a result they are still at an increased risk of associated illness or diseases due to the prescience of PFOS and PFOA in their drinking water.

91.     At all relevant times material hereto, Defendants knew or should have known, that the hazardous and toxic substances contained in their AFFF products would migrate from the location where they were sprayed or stored such as at The Bases and enter the groundwater and contaminate the surface and subsurface area of Plaintiffs and class members' properties and pollute and contaminate the water supply.

92.     At all relevant times material hereto, Defendants failed to advise or warn users of their AFFF products of the dangers associated with expected use of the products such as the discharge and release of hazardous and toxic substances into the air, soil, surface water and groundwater.

93.     Defendants failed to use reasonable care to safeguard those on nearby premises from The Bases from property damage and exposure to the toxic and hazardous exposure to the PFCs as a result of the aforementioned contamination.

94.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs and class members have suffered damages including but not limited to the following: (1) loss of the beneficial use, enjoyment, and exclusive possession of their property; (2) decline in property value as a result of the contamination and specter of contamination in the future; (3) property damage, economic loss and inconvenience in having their property contaminated; (4) past and/or future costs for: air sampling, soil testing, other appropriate testing to determine contamination, use of public water and remediation.

## COUNT II
## Defective Product – Failure to Warn

95.     Plaintiffs hereby incorporate by reference all preceding paragraphs above, as if the same were set forth at length.

96.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling or otherwise distributing AFFF.

97.    Defendants have a duty as the manufacturers of AFFF to provide warnings and instructions to the user.

98.    Defendants knew or should have known that AFFF posed a risk to the users and water supply in and around the area where its product was used.

99.    These risks were not obvious to users of the AFFF.

100.    Upon information and belief, the Defendants failed to provide warnings to the users that the use of Defendants' AFFF could contaminate the water supply of the surrounding areas near The Bases.

101.    Proper instructions and warnings would have avoided the risks to the users and the surrounding areas where the AFFF was used.

102.    As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking water became contaminated with PFOS and PFOA.

103.    As a direct and proximate result of Defendants' failure to warn of the impacts caused by their AFFF, the drinking water supplies in and around The Bases became contaminated with PFOS and PFOA and have caused health risks to Plaintiffs and the Class.

104.    As a result of Defendants' failure to provide proper warnings or instructions Defendants' AFFF is a defective product.

105.    As a direct and proximate result of Defendants' manufacture, sale or distribution of a defective product, Plaintiffs and the Class have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation,

treatment, remediation and monitoring of their drinking water; increased costs of drinking water and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Class are entitled to recover damages.

106.    As a result of Defendants' manufacture, sale and distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Class.

107.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the class.

## COUNT III
## Defective Product – Design Defect

108.    Plaintiffs hereby incorporate by reference all preceding paragraphs above, as if the same were set forth at length.

109.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling or otherwise distributing AFFF.

110.    It was foreseeable that chemicals from the AFFF that Defendants manufactured, sold and distributed would enter the water supply of the Plaintiffs and the Class and cause harm to their persons and property.

111.    Alternative designs of AFFF were available, technologically feasible and practical and would have reduced or prevented the harm to Plaintiffs and the Class.

112.    A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

113.    The AFFF manufactured, sold or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

114.    Defendants' products were defective at the time of manufacture, and, at the time they left Defendants' control.

115.    As a result of Defendants' manufacture, sale or distribution of a defectively designed product, the drinking water supplies in and around The Bases became contaminated with dangerous and toxic chemicals and damaged the Plaintiffs and the Class.

116.    As a direct and proximate result of Defendants' manufacture, sale and distribution of a defective product, Plaintiffs and the Class have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation and monitoring of their drinking water; increased costs of drinking water and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Class are entitled to recover damages.

117.    As a result of Defendants' manufacture, sale and distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Class.

118.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the class.

## COUNT IV
## NUISANCE
### (Against Defendants)

119.    Plaintiffs hereby incorporate by reference all preceding paragraphs above, as if the same were set forth at length.

120. Defendants' wrongful conduct resulted in the interference with Plaintiffs and class members' right to the exclusive use and enjoyment of their property, home and/or well through the invasion of hazardous and toxic substances contaminating their property.

121. The Defendants are liable for a nuisance because their conduct was the legal cause of an invasion of the Plaintiffs and class members' interest in the private use and enjoyment of their land, and the invasion was intentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct.

122. As a result of said nuisance, Defendants have unreasonably interfered with the Plaintiffs and class members' use and enjoyment of their property, to their injury; such that it would cause significant harm to a normal or reasonable person in the community and significant harm to property in normal condition and used for a normal purpose.

123. As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs and class members have suffered damages including but not limited to the following: (1) loss of the beneficial use, enjoyment, and exclusive possession of their property; (2) decline in property value as a result of the contamination and specter of contamination in the future; (3) property damage, economic loss and inconvenience in having their property contaminated; (4) past and/or future costs for: air sampling, soil testing, other appropriate testing to determine contamination, use of public water and remediation.

124. Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the class.

## COUNT V
## MEDICAL MONITORING

125.    Plaintiffs hereby incorporate by reference all allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

126.    As a result of the Defendants' negligence, the Plaintiffs and the members of the class have been subjected to exposure greater than normal background levels of PFOS and PFOA.

127.    As a proximate result of their exposure, the Plaintiffs and members of the class have significantly increased risk of contracting a serious latent disease.

128.    A monitoring procedure exists that makes the early detection of such latent diseases possible.

129.    The prescribed monitoring regime for the early detection of latent diseases caused by exposure to PFOS and PFOA is different from that normally recommended in the absence of the exposure.

130.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

131.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the class.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.    An order certifying the proposed class and designating Plaintiffs as named representative of the class and designating the undersigned as Class Counsel;

B.    An order requiring Defendants (i) to implement a testing protocol to test the wells belonging to each member of the class; (ii) to install permanent filtration devices on any private well testing positive for the presence of PFOS and PFOA, or to facilitate the transition for the class to connect to a municipal water supply; (iii) to establish a blood testing program for Plaintiffs and members of the class; (iv) to establish a medical monitoring protocol for Plaintiffs and members of the class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to PFOS and PFOA; and (v) to take all necessary steps to remediate the property and/or residences of Plaintiffs and members of the class to eliminate the presence of PFOS and PFOA;

C.    An award to Plaintiffs and members of the class of compensatory, exemplary and consequential damages, including interest in an amount to be proven at trial;

D.    An award of attorneys' fees and costs;

E.    An award of pre-judgment and post-judgment interest, as provided by law; and

F.    Such other relief as the Court deems just and proper.


Date October 24, 2016                                        Respectfully submitted,


                                                            _____
                                                            Daniel C. Levin
                                                            Charles E. Schaffer
                                                            Levin Fishbein Sedran & Berman
                                                            510 Walnut Street, Suite 500
                                                            Philadelphia, PA  19106
                                                            (215) 592-1500

                                                            **Attorney for Plaintiffs**

23